UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:

| | |
|---|---|
| Tammie Scoyne, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| TROOPER EVAN MACLEAN, | ) |
| individually and in his official capacity as a | ) |
| Trooper for the Massachusetts State | ) |
| Police Department, | ) |
| | ) |
| Defendant | ) |
| | ) |

## **COMPLAINT**

**INTRODUCTION**

This is a civil rights action against Massachusetts State Trooper, Evan MacLean for falsely arresting Ms. Tammie Scoyne and maliciously prosecuting her for no legitimate purpose while she was lawfully using a rest area along the Massachusetts Turn Pike. She brings this action for damages resulting from a denial of freedom of speech, assault and battery, false arrest and false imprisonment, illegal search and seizure, malicious prosecution, the intentional/reckless infliction of emotional distress and the violation of her civil rights under both the federal and state constitutions.

**PARTIES**

1.      Plaintiff Tammie Scoyne is a natural person and was a resident of the Commonwealth of Massachusetts and the United States of America at all times referred to in this complaint.

1

2. Defendant Evan MacLean is, and was at all times relevant herein, a Trooper in the Massachusetts State Police, he is being sued in his individual and official capacities.

**JURISTDICTION AND VENUE**

3. This is an action under the Federal Civil Rights Act, 42 U.S.C. Section 1983 and 1988; and under the Massachusetts Civil Rights Act, M.G.L. Chapter 12 Section 11i. This Court has jurisdiction pursuant to 28 U.S.C. Section 1331 and 1343. The Plaintiff further invokes the pendant jurisdiction of this Court to consider claims arising under State law sounding in tort, and/or under the Massachusetts Civil Rights Act and/or the Declaration of Rights of the Massachusetts Constitution.

**STATEMENT OF FACTS**

4. On August 18, 2021, at approximately 4:45 a.m. the Plaintiff, Tammie Scoyne, left her residence in Brighton Massachusetts and began driving west on I-90, headed to Pittsfield, Massachusetts.

5. At approximately 5:30 a.m. Ms. Scoyne began feeling too tired to safely drive the full distance of another 90 minutes to her destination, and she decided to make use of the Charleton Rest Area on I-90 West to indeed rest.

6. Upon entering the Charleton Rest Area Ms. Scoyne did not see any signs posted in regard to time limits imposed on travelers for being at the rest area.

7. Based on information and belief, at the time of this incident, there were no posted signs indicting time limits for being at the Charlton Rest Area on the Massachusetts Turn Pike.

8. Ms. Scoyne slept for approximately 4 hours, alone with her dog in her vehicle, a 2009 Honda Accord.

9. Ms. Scoyne left her keys in her ignition in case the use of air conditioning was necessary but maintained everything in the vehicle was off. She did not realize the key being in the ignition in any capacity would drain her car battery.

10. When Ms. Scoyne awoke at approximately 9:30 a.m. she realized her car was inoperable.

11. Since she had replaced the starter in the vehicle two days prior on August 16, 2021, at the Oak Square Sunoco at 602 Washington St. in Brighton Massachusetts for $400.75 and had not driven the car much since the repair, she mistakenly attributed her car's failure to start to a continued malfunction of the vehicle's starter, when in fact it was due to the drained car battery.

12. At approximately 10:00 a.m. Ms. Scoyne made a call to AAA for a tow to a nearby repair facility to have the starter examined and repaired.

13. Ms. Scoyne was quoted around an hour wait for a tow service.

14. All service calls on the Mass Pike are fielded through the Massachusetts State Police, and therefore the Massachusetts State Police would be aware of her situation and presence in the Charleton Rest Area lot.

15. Sgt. John Boland (MSP ID 2953) was explicitly aware of this fact and participated in dispatching the service.

16. Ms. Scoyne waited in the hot sun by her vehicle for approximately 2 hours and because of the presence of her dog, she could not get a reprieve from the heat of the parking lot.

17. Ms. Scoyne spoke with no other patron of the Rest Area during the entire time of her presence there.

18. While waiting for the AAA serviceman, Ms. Scoyne also, did not see any signs posted regarding time limits allowed for vehicles or travelers.

19. Ms. Scoyne also noticed some of the same male operators of the 18-wheel trucks were still in the same spot as they were the night before. These truckers appeared to be resting for the hours they were stationary at the Rest Area.

20. At approximately 11:35 a.m., Ms. Scoyne received a call from a tow truck driver from Interstate Towing Inc., stating that he had been incorrectly told the location of her vehicle as I-90 East, when it was indeed I-90 West.

21. Ms. Scoyne very clearly stated to the AAA representative that she was on I-90 West, and through either the fault of the phone representative or Sgt. Boland, the incorrect Charleton Rest Area location was provided to the tow truck driver,

22. This more than doubled the time it took for the driver to assist Ms. Scoyne due to heavy traffic on the opposite side of the highway and the great distances in between exits on I-90.

23. During this time Ms. Scoyne had to sit in direct sunlight with no way of operating the windows or any air conditioning. Ms. Scoyne was bound to her vehicle and the parking lot because of the presence of her dog.

24. At approximately 11:55 a.m., the tow truck driver from Interstate Towing Inc. arrived to service Ms. Scoyne.

25. As a preliminary step, at about 12:00 p.m., the serviceman attempted to jumpstart the battery on Ms. Scoyne's 2009 Honda Accord and was successful.

26. Both Ms. Scoyne and the serviceman realized at this time that the starter in the car was not the culprit and it was the result of a drained battery. The serviceman then explicitly informed Ms. Scoyne that she should leave the car running for at least 30 minuets to continue to charge the battery.

27. The serviceman left the Charleton Rest Area at approximately 12:05 p.m.

28. At this point, Ms. Scoyne reversed her vehicle out of its previous spot which was facing east in direction, and began driving west in the direction of the onramp for about 2 seconds when she realized she needed to utilize the restrooms at the rest stop & also the restaurants as she was now hungry and thirsty.

29. Ms. Scoyne then parked in a different spot a few feet from her previous parking spot, facing west.

30. Ms. Scoyne decided that the best course of action would be for her to sit in her car for the approximately 30 minutes until she could safely disengage the engine without fear of the vehicle not restarting.

31. From approximately 12:05 p.m., to approximately 12:35 p.m., Ms. Scoyne was happy to avail her dog and herself to the refreshing cold air from her air conditioner after spending around 2 hours in the hot August sun waiting for the serviceman.

32. She rested during this time, at times with her eyes open and at times with her eyes closed, and she at times put her face directly in front of the air conditioning vents to cool down.

33. At approximately 12:30 p.m., a woman in a nearby vehicle, Michelle Lindsay (MA OLN:S21030690; DOB 8/9/73) observed Ms. Scoyne quote "being slumped over her steering wheel and appearing to be unconscious."

34. Ms. Lindsay did not attempt to check on or rouse Ms. Scoyne, but possibly due to COVID-19 concerns at the time, remained in her own vehicle and placed a call to the Charleton State Police.

35. The same Sgt. Boland who fielded the service call for Ms. Scoyne also took the call from Ms. Lindsay about Ms. Scoyne, at 12:30 p.m.

36. At this time Sgt. Boland made the connection about both calls to the station being about the same person- the Plaintiff, Tammie Scoyne. He then dispatched Trooper Evan MacLean (MSP ID 4168) who was on patrol to the Westbound Charlton Area Rest Stop and further advised Trooper MacLean about the previous AAA call due to car troubles from Ms. Scoyne that had occurred at approximately 10:00 a.m...

37. Approximately 12:30 p.m. Trooper MacLean enters the Charlton Rest Area Westbound on I-90, positioning his cruiser behind Ms. Scoyne's Honda. He was alone in his patrol car.

38. Trooper MacLean observed Ms. Scoyne in the Honda Accord, who appeared to be sleeping behind the driver's seat.

39. Approximately 1-2 minutes later, at 12:31 p.m. or 12:32 p.m., Ms. Scoyne deemed it safe to disengage her engine and she did so, and exited her vehicle, headed on foot towards the service plaza.

40. Before Ms. Scoyne could enter the doors to the service plaza, Trooper MacLean appeared in front/left of Ms. Scoyne and called out her name.

41. Ms. Scoyne stopped and spoke with Trooper MacLean.

42. Trooper MacLean asked Ms. Scoyne several questions, such as "how long have you been at the Rest Area?" (since 5:30 a.m.) and "where are you going?" (Pittsfield, MA) as well as "where are you coming from?" (Brighton, MA) while also stating that he was aware Ms. Scoyne was on active probation out of Waltham District Court.

43. Ms. Scoyne politely and truthfully answered these questions.

44. Ms. Scoyne asked why she was being questioned and Trooper MacLean stated it was because a civilian had seen her "passed out" in her car, unresponsive, and called police out of concern for a possible medical emergency.

6

45. Ms. Scoyne then questioned Trooper MacLean how the caller could have known she was unresponsive when nobody had ever approached her vehicle to try and engage with her in any way.

46. Trooper MacLean responded that the caller had indeed exited their vehicle and knocked on Ms. Scoyne's car window in an attempt to rouse her. Ms. Scoyne knew that was unlikely because although she was resting between approx. 12:05-12:32, she was never sleeping nor unconscious, and would most certainly have heard a knock on her window. Ms. Scoyne emphatically conveyed this fact to the Trooper.

47. Trooper MacLean further disputed this fact with Ms. Scoyne, which indeed appears to be false as it was not mentioned in the Trooper's affidavit concerning the incident.

48. The Trooper continued to pepper Ms. Scoyne with questions; during which Ms. Scoyne also conveyed the fact that she had car trouble earlier and Ms. Scoyne provided a summary of the facts of the situation outlined above.

49. Ms. Scoyne was now becoming frustrated and feeling like these questions were not aligned with what a person who needed medical attention would be asked, and much more of an interrogation.

50. Ms. Scoyne asked if this was necessary and stated she needed to use the restrooms, and since Ms. Scoyne had verbalized there was no validity to the call from Ms. Lindsay, Ms. Scoyne asked if she could move on with her day.

51. Trooper MacLean told Ms. Scoyne in a sterner tone that she couldn't go anywhere while he is completing his investigation. In response to Trooper MacLean's use of "threats, intimidation and coercion," Ms. Scoyne then verbally stated her observation that Trooper MacLean seemed to be **"relishing his power discrepancy"** in their dynamic.

52. Trooper MacLean then immediately grabbed Ms. Scoyne by her forearms and spun her around very suddenly and handcuffed her while stating that she was under arrest. This was absolutely in retaliation for the comment Ms. Scoyne had just made.

53. Being aware of Ms. Scoyne's probationary status, Trooper MacLean would have been keenly aware of the many consequences this arrest would have on her; as it would not just ruin her day but cause a cascade of legal issues, violations, and court dates.

54. Ms. Scoyne asked what she was under arrest for, to which Trooper MacLean replied, "for trespassing." Ms. Scoyne was shocked and replied, "How was I trespassing?"

55. MacLean replied, "There's a two-hour limit. You told me you have been there since 5:30 a.m." Ms. Scoyne began crying and protesting, mentioning again how there is proof of her car troubles and that should count for something and to call the State Police Barracks because they could vouch for that. This fell on Trooper MacLean's deaf ears.

56. Trooper MacLean escorted Ms. Scoyne to his patrol car and placed her in the backseat where he read her Miranda rights and then left her in the vehicle with all of the windows up and no air conditioning on.

57. Trooper MacLean then without probable cause or legal justification, proceeded to search Ms. Scoyne's Honda, with her dog still inside, starting with the inside of the car and working his way to the trunk.

58. After approximately 15 minutes of Ms. Scoyne's placement in the patrol car, she was succumbing to the August heat and the Greenhouse effect on the vehicle, and she couldn't breathe and was overheating. Ms. Scoyne yelled out for the Trooper to open a window and she yelled, "I can't breathe!" many times.

59. According to historical weather data, the high temperature on August 18, 2021, in Charleton, Massachusetts was 85 degrees. Which after 10 min in a car with the windows closed is the equivalent to 110 degrees. *

60. After not receiving any notice for some time, Ms. Scoyne resorted to using her only free limbs, her legs, to kick the side window of the patrol car, not intending to damage, but to get the Troopers attention.

61. Without causing any damage, Ms. Scoyne was able to get the Trooper's attention to which he stormed to the patrol car and opened the door and barked at Ms. Scoyne, "Is there a reason you are kicking the car window?!?!"

62. Ms. Scoyne replied through tears, that she couldn't breathe from the heat. Trooper MacLean then turned the air conditioning on, but never opened any window and Ms. Scoyne continued to suffer for several minutes until the air conditioning reached her in the backseat.

63. At approximately 1:00, p.m., the same tow truck driver from Interstate Towing Inc. returned to the Charlton Rest Area, this time under orders to tow Ms. Scoyne's car due to her arrest.

64. Ms. Scoyne pleaded with the Trooper to ask the serviceman about my previous car troubles as validation for why I had been at the rest area awhile and he did not.

65. Trooper MacLean didn't find anything illegal or incriminating in Ms. Scoyne's vehicle search.

66. Ms. Scoyne's Honda was hooked up to the tow truck.

67. Trooper MacLean drove Ms. Scoyne to the Charlton State Police Barracks. Ms. Scoyne cried the entire way.

68. Ms. Scoyne was placed in a jail cell.

69. Hours later, Ms. Scoyne paid her $40 bail, and was given a court date at Dudley Court for the following day, August 19, 2021 via Zoom.

70. Ms. Scoyne returned to the towing facility where she retrieved her automobile and her dog, who was given to Interstate Towing Inc to watch. While they took good care of the scared dog, this was deeply disturbing to Ms. Scoyne as this is not protocol and anything could have happened, especially had she not had the $40 to bail out and needed to be transported to court the following day.

71. Ms. Scoyne spoke with the same serviceman who had jumpstarted her vehicle and also towed it upon her arrest.

72. The driver was appalled at the situation and expressed his pity for Ms. Scoyne in that situation. This driver, unnamed here, is named in official records and has since cooperated with speaking with the POST Commission regarding the Plaintiff's complaint on the matter.

73. Ms. Scoyne paid $240.82 to Interstate Towing Inc to release her car at 4:55 p.m.

74. Ms. Scoyne abandoned her trip to Pittsfield and headed home to Brighton at approximately 5:00 p.m.

75. Ms. Scoyne was arraigned via Zoom at Dudley District Court the following day. Prior to her arraignment, Ms Scoyne did not participate in an evidentiary hearing before a Magistrate.

76. She was given another court date for November 2, 2021, for a Pretrial Hearing.

77. Ms. Scoyne was subsequently deemed in violation of her probation out of Waltham Court and given a court date for that and new terms added to her probation agreement which included random drug testing for which she had to inquire about daily, and at times daily in-person meetings with her probation officer, and the denial of her ability to leave the state of Massachusetts for any reason, including holidays or to see her family who reside in Long Island, New York.

78.    On October 12, 2021, Ms. Scoyne was found noncompliant with these new probation terms, and a warrant was issued for default.

79.    On October 28, 2021, Ms. Scoyne retained the legal counsel of Attorney Richard Chambers Jr. of Chambers Law Office in Lynnfield, Massachusetts, for a $3000 fixed fee, to handle both the Trespassing charge and the probation violation in each corresponding courts.

80.    On November 1, Attorney Chambers represented Ms. Scoyne in the removal of her Default warrant out of Waltham District Court. This resulted in her probation being extended by several days to December 23, 2021- a date pushed forward so Ms. Scoyne could hopefully get to be with her family in New York for Christmas. A next court date of December 2, 2021 was set at this court date.

81.    On November 2, 2021 Attorney Chambers represented Ms. Scoyne in Dudley District Court and succeeded in getting the Trespassing charge dismissed.

82.    On December 23, 2021 Attorney Chambers represented Ms. Scoyne at the successful completion of her probation and the dismissal of her case from Waltham District Court.

## COUNT I – VIOLATION OF 42 U.S.C. § 1983 – DENIAL OF FREEDOM OF SPEECH /RETALIATION

83.    Plaintiff re-alleges paragraphs 1 through 82 and incorporates them herein by reference.

84.    The aforesaid actions and conduct by Defendant MacLean violated Plaintiff's right to engage in protected speech without being subjected to retaliatory actions as guaranteed by the First and Fourteenth Amendments to the United States Constitution and Part I Articles 7, 16, and 18 of the Declaration of Rights of the Massachusetts Constitution and in violation of the Massachusetts Civil Right Act (M.G.L. c 12 §11i).

85. As a result of the above-described violation of rights, Plaintiff suffered great pain of mind and body and was otherwise damaged.

## COUNT II – VIOLATION OF 42 U.S.C. § 1983-
## FALSE ARREST & FALSE IMPRISONMENT

86. Plaintiff re-alleges paragraphs 1 through 85 and incorporates them herein by reference.

87. Defendant MacLean, in arresting the Plaintiff without probable cause and unlawfully detaining her violated her rights guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and the Declaration of Rights of the Massachusetts Constitution. These actions were also in violation of the Due Process Clause and Equal Protection Clauses of the 5th and 14th Amendments.

88. As a direct and proximate cause of the above-described violation of rights, Plaintiff suffered great pain of mind and body and was otherwise damaged.

## COUNT III – VIOLATION OF 42 U.S.C. § 1983-
## MALICIOUS PROSECUTION

89. Plaintiff re-alleges paragraphs 1 through 88 and incorporates them herein by reference.

90. By arresting Ms. Scoyne and initiating criminal proceedings against her, with malice and without probable cause, and with the prosecution ending in the Plaintiff's favor, Defendant MacLean has engaged in an malicious prosecution of the Plaintiff in violation of the Due Process and Equal Protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Part I of the Massachusetts Constitution.

91. As a direct and proximate cause of the above-described violation of rights, Plaintiff suffered great pain of mind and body and was otherwise damaged.

## COUNT IV- VIOLATION OF 42 U.S.C § 1983- ILLEGAL SEARCH AND SEIZURE

92. Plaintiff re-alleges paragraphs 1 through 91 and incorporates them herein by reference.

93. As a direct and proximate result of the malicious, wanton and willful acts of defendant Trooper MacLean, acting under color of law, plaintiff was intentionally and unlawfully detained, confined without probable cause, and thereby was deprived of rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and the Declaration of Rights of the Massachusetts Constitution to be free from a warrantless search and or without any other lawful justification.  The plaintiff was also damaged in her reputation, embarrassed, prevented from engaging in her usual activities, and caused to endure suffering and mental anguish.

94. The plaintiff is thereby entitled to damages under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. Sections 1983 and 1988, the Declaration of Rights of the Massachusetts Constitution, M.G.L. Chapter 12, Section 11I, and under Massachusetts common law for coercion, intimidation, and violence.

## COUNT V- ASSAULT AND BATTERY

95. Plaintiff re-alleges paragraphs 1 through 94 and incorporates them herein by reference.

96. Defendant MacLean did unlawfully commit an assault and battery against the Plaintiff in violation of Massachusetts Common Law.

## COUNT VI – INTENTIONAL AND/OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

97. Plaintiff re-alleges paragraphs 1 through 96 and incorporates them herein by reference.

98. As a direct and proximate result of the acts of the defendant, the plaintiff did suffer severe emotional distress, mental anguish, fear, humiliation, and embarrassment of such severity and nature that no reasonable person could nor should be expected to endure.

99. The Defendant knew or should have known that his acts would cause such emotional distress, mental anguish, humiliation and embarrassment and said acts were intentionally/recklessly inflicted without legal justification.

100. As a direct and proximate cause of the above-described violation of rights, Plaintiff suffered great pain of mind and body and was otherwise damaged.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant on all counts of this complaint and:

a) Award substantial compensatory damages;

b) Award substantial punitive damages;

c) Award interest and costs of this action to Plaintiff;

d) Award attorneys' fees to Plaintiff; and

e) Award such other relief which this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully Submitted,
Tammie Scoyne
By its Attorneys,

<u>/s/ Philip C. Ciccarelli</u>
Philip C. Ciccarelli, Esq. BBO#678452
55 North Pleasant Street

14

Amherst, MA 01002
Phil@ciccarelli.law
Charles J. DiMare, Esq. (of Counsel)
BBO#124820
126 Elmore Street
Shelbourne, VT 05482
Charles.J.DiMare@gmail.com

## CERTIFICATE OF SERVICE

I, Philip C. Ciccarelli, Esq., hereby state that the foregoing was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 8, 2024.